```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
AQUA STOLI SHIPPING LTD.,             :
                                      :
              Plaintiff,              :    05 Civ. 6929 (JSR)
                                      :
              -v-                     :    OPINION AND ORDER
                                      :
GARDNER SMITH PTY LTD.,               :
                                      :
              Defendant.              :
------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

      This case presents a question that has taken on heightened significance because of recent developments in the hoary law of maritime attachments: whether a district court has the authority to vacate a maritime attachment that, while facially complying with the statutory requirements, does not meaningfully serve the purposes such attachments are meant to advance and/or creates harm to the attached party that substantially outweighs the benefits to the attaching party. The Court finds that a district court has such authority and that the exercise of that authority in this case requires the Court to vacate the order of attachment previously obtained by the plaintiff and dismiss the underlying complaint.

      The pertinent facts are undisputed. Plaintiff Aqua Stoli Shipping Ltd. ("Aqua Stoli") is a company organized under the laws of Liberia solely for the purpose of owning and operating the vessel Aqua Stoli. Complaint ¶ 2; Declaration of Christopher Charles Morkane, 8/31/05 ("Morkane Decl."), ¶ 12. Defendant Gardner Smith Pty Ltd. ("Gardner") is an Australian company that has been in existence for more than 80 years and that last year had revenues

exceeding $800 million. Morkane Decl. ¶¶ 2-3. By charter party dated April 11, 2005, plaintiff chartered its vessel to defendant for the carriage of a cargo of tallow from Brazil to Pakistan. Complaint ¶ 4. However, when the time came for the tallow to be loaded onto the Aqua Stoli, defendant rejected the vessel as unfit to carry its goods. Believing this repudiation to be wrongful, plaintiff, in accordance with a forum selection clause in the charter party, initiated an arbitration proceeding against defendant in London, claiming damages totaling about $1.45 million. Complaint ¶¶ 5-9. Defendant is counterclaiming in the London arbitration for similar damages. Morakane Decl. ¶ 4.

In June, shortly after the arbitration commenced, defendant, fearing that plaintiff intended to sell the Aqua Stoli, obtained an order in Singapore arresting the vessel and holding it there unless and until plaintiff posts $1.45 million in pre-judgment security. Id. ¶ 12. Plaintiff is contesting both the arrest and the requirement that it post the $1.45 million, and a hearing is expected in Singapore later this month. Id.

In response to these developments, plaintiff filed the instant action on August 4, 2005, together with an ex parte application for an order permitting it to attach any property held by defendant in this district up to the sum of $1.45 million. In accordance with the Supplemental Rules for Certain Admiralty and Maritime Claims ("Admiralty Rules"), Rule B(1)(b), the order was granted subject to being thereafter contested by defendant. The

2

attachment order was then served on various New York City financial institutions, as a result of which plaintiff was able to attach certain electronic fund transfers (EFTs) to or from defendant that were being routed through financial institutions in New York on their way from one overseas institution to another.[1] On August 29, defendant, over which the Court otherwise would have no personal jurisdiction, made a general appearance and asserted its right to a hearing within three days to contest the attachment order. See Admiralty Rule E(4)(f); Local Admiralty Rule E.1, S.D.N.Y. Accordingly, the Court received submissions from each side and heard argument on September 2, 2005.

Maritime attachments have historically been much easier to obtain than other pre-judgment attachments, requiring only the very modest showing that the defendant whose assets are to be attached "is not found within the district." Admiralty Rule B(1)(a); compare, e.g., SG Cowen Sec. Corp. v. Messih, 224 F.3d 79, 81 (2d Cir. 2000) (describing New York state rules for pre-judgment attachments in non-maritime civil actions, which incorporate "equitable criteria traditionally required for the granting of preliminary injunctive relief," including likelihood of success on the merits and threat of irreparable harm). This is in recognition of the transient nature of vessels and other assets in the shipping business, and the special difficulties maritime plaintiffs consequently face in gaining

---

[1] Although the precise sum so far attached is unclear, it is plaintiff's intention to continue serving notices of attachment on these institutions until it has captured the full $1.45 million.

3

jurisdiction over defendants and collecting any judgments won. See Seawind Compania, S.A. v. Crescent Line, Inc., 320 F.2d 580, 581-82 (2d Cir. 1963) (stating that the two purposes of maritime attachments are "to obtain jurisdiction of the respondent in personam through his property [and] to assure satisfaction of any decree in libelant's favor").

Two developments in recent years have modified this situation. On the one hand, the extent of attachable assets has been extended far beyond the traditional paradigm of ships and cargo. Most notably, the Second Circuit has recently upheld the practice of attaching funds routed through New York, the financial capital of the world, no matter how ephemeral and serendipitous their brief "presence" in the district may be. See Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 273 (2d Cir. 2002).

On the other hand, Congress in 1985 added a layer of due process to a procedure that historically required a plaintiff to do no more than obtain a piece of paper from the clerk of the court, without a judge's participation and without any notice (let alone a chance to respond) being given to the defendant. Id. at 269. While the attachment may still be obtained ex parte in the first instance, the plaintiff must submit his papers to a judge, who ensures that the plaintiff makes out a prima facie case of entitlement. Id. at 271-72; Admiralty Rule B(1)(b). More importantly for present purposes, Congress also added the provision that any person claiming an interest in the attached property is "entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or

4

attachment should not be vacated or other relief granted consistent with these rules." Admiralty Rule E(4)(f). This provision, which brought other districts into conformity with a practice already adopted by the Southern District of New York, "is designed to satisfy the constitutional requirement of due process by guaranteeing to the shipowner a prompt post-seizure hearing at which he can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Id. advisory committee's note.

It is thus clear that the party obtaining the attachment order bears the burden at the subsequent hearing of justifying it. What is left unclear is the nature of the assessment that the Court must make at such a hearing. On plaintiff's view of the law, all it need show is that it meets the statutory requirements that this is a maritime claim and that the defendant is not found within the district. Defendant contends that, in addition, plaintiff must show that the attachment order would genuinely serve at least one of the two traditional purposes of obtaining jurisdiction over the defendant or securing payment of any plaintiff's judgment. Moreover, defendant argues that, even if these showings are made by plaintiff, a defendant can still defeat an attachment order by showing, e.g., that plaintiff's real purpose in obtaining the order is simply to gain a tactical advantage, or that the prejudice to the defendant from the order materially outweighs its benefit to the attaching party. More generally, defendant argues that Congress, in prescribing a hearing in addition to judicial review of the attacher's ex parte application, must have contemplated that courts would exercise their

5

ordinary equitable authority to vacate attachments that are abusive, unfair, or otherwise not in keeping with attachments' traditional purposes.

The Second Circuit has not spoken to this issue, and the district courts, while not addressing the issue head-on, are arguably somewhat divided. Compare Parkroad Corp. v. China Worldwide Shipping Co. Ltd., 2005 U.S. Dist. LEXIS 11122, at *5 (S.D.N.Y. June 6, 2005) (once plaintiff makes prima facie showing that it has a maritime claim against defendant in the amount sued for and that defendant was not present in the district when suit was filed, attachment order should be permitted notwithstanding defendant's subsequent appearance) and HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.A. de C.V., 2005 U.S. Dist. LEXIS 8009, at *16 (S.D.N.Y. May 4, 2005) (plaintiff is entitled not simply to "the smallest amount of security possible to force [defendant] to file an appearance," but to the full amount sued for) with Allied Maritime, Inc. v. The Rice Corp., 2004 U.S. Dist. LEXIS 20353, at *5 (S.D.N.Y. October 12, 2004) (plaintiff must show that attachment order is necessary either to obtain jurisdiction over defendant or to ensure satisfaction of judgment it may win; otherwise, attachment order "may be vacated as unfair") (internal quotations omitted).

It is worth noting, however, that the procedure Congress adopted in amending Rule E(4)(f) was expressly based on the judge-made procedures developed in the Southern District of New York. See Rule E(4)(f) advisory committee note. The district courts who developed these procedures plainly recognized their inherent power

6

and responsibility to ask whether "plaintiffs' need for security is real [and] their quest for attachment is not a tactic of harassment," and then, should the answer be in the negative, "to set aside an unfair attachment."  <u>Integrated Container Serv., Inc. v. Starlines Container Shipping, Ltd.</u>, 476 F. Supp. 119, 124 (S.D.N.Y. 1979) (Leval, J.).  Indeed, as Judge Leval articulated, such an inquiry is critical, because the ease with which a <u>prima</u> <u>facie</u> case for attachment can be made otherwise creates a real risk of "abusive use of the maritime remedy."  <u>Id.</u>

The Court concludes that not only the historic practice in this district but also a reasonable interpretation of what Congress had in mind in amending Rule E(4)(f) requires the following:

At an attachment hearing, the plaintiff must show, by a preponderance of the evidence, that the attachment order not only meets all technical requirements but also is reasonably calculated to serve at least one of the two historical purposes of obtaining jurisdiction or securing a judgment and is not simply a tactical device designed to harass the adversary in an ongoing litigation. Assuming it can show that, the defendant then has the burden of showing, by a preponderance of the evidence, that, nonetheless, the hardship the attachment order imposes on it or others substantially outweighs any benefit to the plaintiff.

Applying this test, the Court finds, first, that plaintiff cannot meet its initial burden.  Its purpose in obtaining the attachment order is merely tactical -- to obtain leverage over the defendant in the parties' battles over the merits of the case in

7

London and over whether plaintiff's vessel was properly arrested in Singapore. Plaintiff's ability to collect a prospective judgment is remarkably secure, not simply because defendant is a very large, stable company with no demonstrated history of failing to make good on judgments, but also because defendant's need to use the world's financial markets regularly ensures that attachment of EFTs will be as available post-judgment as it has been pre-judgment. Any claim of potential insecurity is thus both hypothetical and farfetched. See Allied Maritime, 2004 U.S. Dist. LEXIS, at *8-*9; Royal Swan Navigation Co. Ltd. v. Global Container Lines, Ltd., 868 F. Supp. 599 (S.D.N.Y. 1994). That the plaintiff's own assets have been arrested elsewhere is irrelevant; permitting a litigant to match tit for tat is not a recognized purpose for maritime attachments.

Moreover, even assuming, contrary to fact, that plaintiff could meet its burden, defendant has carried its reciprocal burden of showing prejudice that substantially outweighs any benefit. Here, even plaintiff argues that the only benefit is to secure any future plaintiff's judgment against a highly improbable event, such as defendant's going into bankruptcy. By contrast, the attachment order imposes a highly probable and immediate burden on defendant, and potential disruption to the financial markets themselves, because of the uncertainty wrought by the erratic attachment of EFTs. In a world where transactions are expected to be consummated instantly and with certainty, the attachment of EFTs may cause a defendant and its business partners to unwittingly breach contracts and incur damages, legal and reputational, that far outstrip the sums to be attached.

While such attachments may sometimes be appropriate, they should be permitted as a matter of necessity, not of right.

Accordingly, defendant's motion to vacate the attachment order is granted. In addition, because this action serves no purpose other than to facilitate the attachment order that has now been vacated, the complaint is hereby dismissed with prejudice. Clerk to enter judgment.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
September 4, 2005